632 A.2d 248

Robert V.L. SHARP, et al.

v.

HOWARD COUNTY BOARD OF APPEALS, et al.

No. 103, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Nov. 1, 1993.

58

Roger W. Titus (Paula T. Laboy and Venable, Baetjer and Howard, on the brief), Rockville, for appellants.

Lonnie R. Robbins, Asst. County Sol. (Barbara M. Cook, County Sol., on the brief), Ellicott City, for appellee Howard County.

Thomas E. Lloyd (Lloyd, Kane & Wieder, P.A., on the brief), Ellicott City, for appellees Enos C. Levy, et al.

Argued before ALPERT, HARRELL and MURPHY, JJ.

HARRELL, Judge.

*Id imperfectum manet dum confectum erit (it ain't over until it's over).*

Once more (and perhaps for the last time), the judiciary of Maryland has been implored to resolve a skirmish in Howard County's answer to the Hundred Years War. A stalwart band of Howard County property owners who are operating a private airstrip on a portion of their residential properties have bested, with the aid of the Howard County Board of Appeals that has sanctioned the continuation of the aerial activities, a coterie of the airstrip's equally stalwart but disgruntled neighbors. We shall try our level best to end this land use civil war.

Robert V.L. Sharp, other individual neighbors, and Crosen Development Co., appellants, ask that we reverse a judgment of the Circuit Court for Howard County affirming the grant of a special exception by the Howard County Board of Appeals (the Board). The special exception permits the continued use of a private use/private ownership aircraft landing strip along an easement created by covenant on eight discrete parcels owned by the thirteen individual applicants. It also provides

for the storage of a maximum of three airplanes on the applicants' properties.

## QUESTIONS PRESENTED

Appellants have framed two queries for our consideration:

I. Is the holding of *Schultz v. Pritts* [1] properly applied when a Board of Appeals refuses to make any finding of fact regarding the uniqueness of adverse effects on vicinal properties of a proposed special exception use, and there is uncontroverted evidence of both adverse effects and unique adverse effects on the vicinal properties?

II. Did the lower court err when it sustained an agency decision which was expressly premised upon an erroneous application of the law?

For reasons we shall explain, we shall affirm the circuit court's judgment.

## PROCEDURAL PROLOGUE

In 1973, the then owners of the eight contiguous parcels of land in Howard County that are the subject of the instant special exception executed and recorded a Declaration of Covenants. The covenants created reciprocal easements on a 150 foot wide strip of land running across all of their properties for the purpose of creating a private air strip. We shall sometimes refer to the airstrip hereafter by the name, "Glenair," which is also how the Federal Aviation Agency (FAA) and the Maryland State Aviation Administration (MAA) identify it.

In August 1978, the owners of the eight properties sought a special exception to operate Glenair. After public hearings, the Board as then constituted denied the special exception, concluding that the proposed use would adversely affect vicinal properties. The applicants appealed that denial to the Circuit Court for Howard County. The circuit court remanded the case to the Board for reconsideration, in light of the

---

1. 291 Md. 1, 432 A.2d 1319 (1981).

standard for evaluating the impact of proposed special exception uses enunciated in *Schultz v. Pritts, supra,* which had been decided since the Board's denial. We affirmed that remand in *Sharp v. Somerlock,* 52 Md.App. 207, 447 A.2d 500 (1982).

While the appeal in *Sharp v. Somerlock* was pending, one of the eight parcels of land subject to the covenants was sold. The buyers, Marvin and Mary Alice Schaefer, were opposed to Glenair. At one of the public hearings held before the Board in 1983 pursuant to the remand, the Schaefers asked to be removed from the list of applicants for the special exception, and that their parcel of land be deleted from the petition. The Board granted the Schaefers' request. It also granted the special exception on 20 September 1983. The Board, in applying its view of the rule of *Schultz v. Pritts* to the facts before it at that time, explicitly found and concluded that

> the protestants have failed to adduce evidence which demonstrates that granting the special exception use would result in adverse effects upon adjoining and surrounding properties unique and different from the adverse effects that would otherwise result from the location of a private aircraft landing and storage area anywhere within the R Zoning District.

The protestants, many of whom remain as appellants in the instant appeal, took umbrage and appealed. The circuit court affirmed the Board's action, and an appeal to this court followed. We reversed, holding that the Board did not have the authority under the Howard County zoning ordinance to grant the special exception petition because the Schaefers' withdrawal from participation in the petition caused the amount of land proposed for the airstrip use to fall below the minimum required by the local ordinance. *Fiol v. Howard County Board of Appeals,* 67 Md.App. 595, 508 A.2d 1005 (1986). Nevertheless, we expressly declined to consider whether the Schaefers' withdrawal violated the 1973 Declaration of Covenants.

Following our decision in *Fiol*, the remaining applicants sought an injunction to compel the Schaefers to join the special exception petition in compliance with the Declaration of Covenants. The circuit court granted the injunction and ordered the Schaefers to execute the petition. The Schaefers appealed.

In an unreported opinion, we construed the language of the Declaration of Covenants and determined that the Schaefers' withdrawal violated the covenants. *Schaefer v. Levy*, 74 Md. App. 732, 737 (1988). As a result, the petition was considered anew by the Board. Evidentiary hearings were held on 8, 15, 22, and 26 September and 8 November 1988. On 9 March 1989, the Board again granted the special exception for Glenair, but not without dissent. A three member majority of the Board joined in a Decision and Order approving the petition subject to a list of conditions. Among the required findings of fact made by the Board majority in its Decision appears the following statement of the Board's understanding of how *Schultz v. Pritts* applies, or does not apply, to granting the special exception:

The Board finds that the use will not adversely affect vicinal properties.

In its regulations the Zoning Board has allowed airfields to be located in R (Rural) Zoning Districts, subject to the satisfaction of certain conditions noted in the Zoning Regulations. The Zoning Board also permits residential development on minimum three-acre homesites in this category of zoning district. Thus the Zoning Board must have envisioned the possibility that these two types of uses, a private airfield and residences, may be in some proximity to each other. Given this presumption, the Board must determine whether or not vicinal property owners are affected in a manner beyond that contemplated by the Zoning Board, that is, adversely. If the Board's decision would be in the affirmative, then, under the doctrine of *Schultz v. Pritts*, the Board would decide whether or not this adverse effect on these vicinal properties would be unique and different from the adverse effects that would otherwise result from the

location of a private aircraft landing and storage area anywhere within the R Zoning District. Since the Board finds that the proposal, as set forth in the Petition and Noise Control Plan, will not adversely affect vicinal properties, it does not need to decide the issue that must be addressed under *Schultz.*

The two member Board minority [2], in a classic riposte, cast its Dissent, in part, as a contrary view of the interplay of *Schultz v. Pritts* and the obligation of the Board to evaluate the perceived adverse effects presented by the evidence before it:

> The inherent adverse effects of the use are uniquely intensified in this particular location. While adverse effects are inherent in the proposed special exception use, (e.g. negative impact on property values evidenced by the reduction in tax assessments and in the noise effects on the peaceful enjoyment of homes), this particular area of the County's Rural (R) zone has a noticeably higher concentration of existing and proposed development, a significant number of approved special exception uses, and three (3) public schools in the immediate area. Thus, the Petitioners have failed to meet the standards as elucidated in *Schultz v. Pritts.* (citation omitted).

Appellants noted an appeal to the circuit court. In addition to contesting the merits, they requested that the assigned judge in the circuit court recuse himself because he had, while practicing law in 1973, drafted the Declaration of Covenants that served as the foundation for the establishment of Glenair. The judge declined to recuse himself and proceeded to affirm the Board's grant of the special exception.

Appellants then took an appeal to us. In an unreported opinion, a different panel of this court held that it was not an abuse of discretion for the circuit court judge to refuse to recuse himself, that the Board majority's interpretation of

---

**2.** Which included a member of the 1983 Board that had apparently unanimously granted a time-conditioned special exception for Glenair.

*Schultz v. Pritts* was appropriate, and that the Board's decision be affirmed. *Robert V.L. Sharp, et al. v. Howard County, Maryland, et al.,* 87 Md.App. 806, 814 (1991).

Continuing to spin the judicial roulette wheel, appellants took their case to a higher court. In *Sharp v. Howard County,* 327 Md. 17, 607 A.2d 545 (1992), the Court of Appeals reversed our decision on the ground that the circuit court judge should have recused himself.[3]

The matter was remanded to the circuit court where a different judge, on 16 November 1992, affirmed the Board's decision and observed, with a trace of prophecy and futility, that

> On remand, Appellants press anew their argument that the Howard County Board of Appeals (the "Board") did not correctly apply *Schultz v. Pritts,* 291 Md. 1 [432 A.2d 1319] (1985) [ (1981) ] in granting a special exception for a private use-private ownership aircraft landing and storage area in an R (Rural) Zoning District.

> \*     \*     \*     \*     \*     \*

Whether to grant a special exception for the aircraft landing and storage area has been in litigation in one form

---

**3.** The case *sub judice* might also present on its face a potential application of the law of the case doctrine. Appellees have not asserted this issue in their briefs or at oral argument. It was not addressed or decided by the circuit court. Accordingly, we shall not decide it. Were we to consider this point, we would find no merit in it.

The unreported opinion of the Court of Special Appeals filed in 1991 addressed the very issue concerning *Schultz v. Pritts* that appellant raises anew in the case *sub judice*. There are no additional facts before us than were before the panel that addressed and disposed of that issue in that appeal. Although the Court of Appeals was thereafter petitioned by appellants to accept *certiorari* on both the recusal and the *Schultz v. Pritts* questions, the Court specifically limited its grant of *certiorari* to the recusal issue.

We are persuaded, however, that the law of the case doctrine as to the *Schultz v. Pritts* issue should not be applied to the instant appeal. The Court of Appeals reversed, albeit on another ground, the prior judgment of the Court of Special Appeals. This had the effect of permitting not only the circuit court, but ourselves, to freshly confront appellants' arguments regarding the Board's understanding of and adherence to *Schultz v. Pritts*.

or another for decades, and this Court has no illusion that this Order will end the string of appeals and remands. However, this Court is satisfied that the Board's decision was supported by substantial evidence, was within its discretion to reach, and did not violate any applicable legal standards.

This Court has also considered Appellants' alternative request that this Court remand the case to the Board for additional proceedings and findings to insure that the Board has correctly applied *Schultz*. While arguably a further remand may well produce a more perfect and exquisite determination, this Court believes that the Board's findings and decision clearly express its intentions.

The instant appeal inexorably followed.

### SUMMARY OF THE RELEVANT EVIDENCE BEFORE THE BOARD

The subject property of Glenair, inclusive of the airstrip, is comprised of 45 acres. Glenair is located on the east side of Sharp Road, about 1700 feet north of Shady Lane, in the Glenwood area of Howard County. The 45 acres is comprised of eight contiguous parcels, each about 5.5 acres in size. The parcels, sited side-by-side in a east/west direction, form a rectangle. The grass air strip is located within an easement along the southerly portions of all of the parcels. The easement is 150 feet wide and 3200 feet long. The actual aircraft runway within the easement is 40 wide and 2178 feet long. The ends of the runway are 500 feet from both the east and west boundaries of the subject property. The south edge of the runway is 104 feet from the southerly edge of the subject property. Among the reasons given by the applicants in the special exception application for the selection of the subject property as the site of Glenair was that it is

higher than the surrounding land. The average elevation of Howard County piedmont land is 450 to 500 feet above sea level; this site is 590 feet above sea level, and there are no hills or trees in the surrounding area to pose obstructions

during landings and takeoffs. The elevation difference keeps airplanes higher above the surrounding land and buildings during landings and takeoffs.

The special exception application requested permission to continue a private aircraft landing and storage area pursuant to § 126 F.2.a. of the Howard County Zoning Ordinance. Two airplanes had been stored on the subject property since 1983. According to the applicants' records, since 1983 there had been 341 flights from Glenair, or about one flight (takeoff and landing) every 5½ days on the average. The applicants also produced testimony and internally-generated records regarding occasional landings or overflights by planes not based at Glenair or involving invited guests. Where identification of the uninvited miscreants was obtained, applicants attested to their efforts to warn the pilots and ward-off repeat episodes.

Glenair's operations are subject to a noise control plan approved by the MAA. *See generally* COMAR 11.03.03. This plan, when combined with mandatory FAA regulations, obligated Glenair's legitimate users: (a) not to fly over the nearby Glenelg High School, Glenwood Middle School, and Bushy Park Elementary School at any altitude; (b) not to engage in any landing patterns from the north where the high school is situated; (c) not to fly over adjacent residential areas at an altitude of less than 1000 feet or at more than fifty percent of an aircraft's maximum engine power; and, (d) to avoid overflight of adjacent residences during takeoff until reaching an altitude of 1000 feet. The noise control plan also calculated and mapped noise impact contours on the surrounding properties that projected noise levels from the operations of Glenair would not exceed the State-prescribed maximum level for land zoned for single family, detached residences. Compliance with the decibel limits established in the plan was asserted through anecdotal testimony of applicants and some neighbors, as well as a noise measurement study of aircraft takeoff, landing, and taxi operations conducted by one of the applicants, an electrical engineer by occupation. He characterized the peak noise level as comparable to that of a riding lawn mower, but of a much shorter duration.

An expert in real estate appraising opined, from a study he made of Glenair, another nearby private airstrip, and surrounding areas, that there had not been any impact on property values as a result of Glenair's continued operations.

The applicants also produced evidence of the relative safety of general aviation activities nationally and Glenair specifically. Reference was made to FAA and Aircraft Owners and Pilots Association (AOPA) statistics in support of this contention. Mr. Albert J. Selby, Director of Regional Aviation Assistance of the MAA, opined on the record with regard to Glenair:

> It is a safe airport. Among all the licensed and registered grass airstrips in the State, Glenair is one of the finest and safest with excellent approaches and a well maintained, lighted, level and solid turf landing strip. The orientation of its landing strip into the prevailing wind, its elevation being higher than the surrounding terrain, its location in open, lightly developed countryside all combine to make this strip one of the outstanding private airstrips in the State.

Because *Schultz v. Pritts* was so keenly on everyone's minds, the opponents' testimony and demonstrative evidence were singularly focused on demonstrating their thesis that the particular facts and circumstances attendant to Glenair caused adverse effects on vicinal properties that were unique to this neighborhood as opposed to elsewhere in the R (Rural) Zone in Howard County. To this end, appellant Robert V.L. Sharp testified that the closest boundary of his property was 600–650 feet west of the westerly end of the airstrip, and that his land was "higher than the runway." [4] As a consequence of this

---

4. The Technical Staff Report of the Office of Planning and Zoning for Howard County, dated 12 August 1988 (Staff Report), described the subject property and its airfield as being "on a ridgeline that places them slightly above surrounding properties to the north, west, and south."

Although appellants also argue in their brief that they produced evidence that the adjacent properties east of the subject property and the runway were also situated at a higher elevation, it is not at all apparent from the record extract that that is so. The testimony of the opposition's consultant, former FAA employee Clyde W. Pace, and opposition Exhibit No. 29 which he prepared, do not clearly establish

difference in elevation and some unspecified "grading into the hill" attributed to the applicants, he could not see aircraft sitting on the ground preparing to take off to the west. His first view was when they "pop up from the west end." He found this activity noisy and "at times scary." He related an episode occurring on Saturday morning, 20 May 1984, when he was bush-hog mowing a portion of his property on a farm tractor. He had his back to the airstrip as he was slowly mowing. A plane that he subsequently recognized as one stored at Glenair apparently took off to the west and startled him when it got close enough to be heard over the masking noise of the tractor and mower. When he heard the sudden noise of the plane, his body involuntarily jerked violently and he struck his leg on the tractor, thereby curtailing his activities for the rest of the morning while he applied ice to his injured leg.

Clyde W. Pace, a former FAA employee offered by appellants as an expert, visited the site and testified that certain structures or objects in the vicinity of the airstrip might be contrary to certain FAA airport standards binding on airports that receive federal aid. Glenair receives no such subsidy and, hence, these standards were, at best, apparently deemed by the Board to be guidelines or suggestions in the special exception case. The potential obstructions within the so-called "transition slopes" adjacent to the airstrip identified by Mr. Pace were: "some trees" 20 feet tall on an unspecified plot of land potentially within a so-called southerly side transition slope; a 60 foot tall metal tower located "perhaps 100 feet" east of the easterly edge of the runway; and, a powerline 500 feet west of the westerly end of the runway.

The Board heard additional evidence concerning the arguably unique locational features of the airstrip and its vicinal properties. Three schools are located in the vicinity of the airstrip. It was asserted that this is the only place in the R

---

this point. Moreover, appellants' reliance on the undecipherable excerpt of a 600 scale topographic map contained in the Staff Report to prove this point is a "reach."

(Rural) District that has three schools in such close proximity to one another. In addition, the only public high school within the R (Rural) District is one of these three nearby schools. The location of the schools makes the vicinal properties very appealing to home buyers.

Evidence of ongoing residential development occurring within a one mile radius of the airstrip was offered to support appellants' contention regarding the unique character of the neighborhood. Twenty-two subdivision record plats, encompassing over three hundred acres of development, had been approved and filed. Moreover, five proposed residential subdivisions, encompassing over four hundred additional acres of development, including a large subdivision that abuts the east end of the airstrip, were then in the approval and recordation process. The tax maps of the surrounding area, received in evidence before the Board as Protestant's Exhibit 10, reflected the residential development in the vicinity of the airstrip.[5] By contrast, the area to the west of the subject property was less developed.

Furthermore, appellants drew the Board's attention to the approval of eleven special exceptions, also within a one mile radius of the proposed airstrip. Robert V.L. Sharp, who compiled the list of the special exceptions, testified he could find no other R (Rural) District in the County with such a concentration of special exceptions within a one mile radius. These approved special exception uses were residential in nature, and included a nursery school, three churches, three craft shops, a hair salon, a riding stable, a two family dwelling,

---

5. This was not, however, a compendium of novel information. The Staff Report obviously perceived the growth potential of the area when, in its "Evaluation and Conclusions" section, it observed:

The infrequent use of the landing strip will not necessarily hinder or discourage the use of adjacent land since these sites, if subdivided, will be at least 3 acres in size. Any significant increase in airfield use over present levels of activity seems unlikely given that the airfield is private and only three aircraft would be stored there. However, if subdivision occurs and houses are constructed, the presence of the airfield may require revision of the submitted Noise Control Plan to prevent any adverse impacts on nearby properties.

and a parking area for school buses that service the three nearby schools.

The thrust of appellants' evidence with regard to the proximity of residential development, schools, and the special exception uses, besides endeavoring to distinguish the area from other R (Rural) Districts that might be less developed or have less development potential, was to demonstrate receptors for the actual adverse effects from Glenair's operation based on noise and safety concerns. As to noise, several witnesses, in addition to Robert V.L. Sharp, attested to being annoyed, irritated, or otherwise having the enjoyment of their property intruded upon by Glenair-related air traffic or unidentified flights that they associated with the existence of Glenair. Witnesses who addressed safety concerns conjured reports of military, commercial, and general aviation accidents, some of which they had witnessed and others repeated from hearsay, that had resulted in human tragedy and property damage. The spectre of a replication of such an event in the area of Glenair was visualized by the opponents.

Appellants' other assault on the special exception application was aimed at a perceived adverse effect on property values. Testimony of reductions in tax assessments on two vicinal properties was related to the presence of the airstrip. Bruno Reich, one of the applicants whose property was subject to the Declaration of Covenants, had requested and received a reduction in the assessment on two of the sub-lots of his parcel because the restrictions of the easement creating the airstrip precluded the erection of buildings on the sub-lots that fell within the easement. The assessment on the balance of Reich's parcel was apparently unaffected by the existence of the airfield. One of the opponents, Charles Sharp, had obtained a 10% reduction in the fair market value of his property due to "airport factors." This reduction, denied him by the local Supervisor of Assessments & Taxation, was achieved only after the Maryland Tax court sustained a decision apparently by the local Property Tax Appeals Board in Mr. Sharp's

favor after the Supervisor appealed.[6] The Board, in its questioning of the applicants' appraisal witness, Walter Reiter, also elicited an opinion that an airfield would likely be a factor that potential home buyers would consider as mitigating against purchasing a home in the vicinity of the airfield.

The Board, in its 9 March 1989 Decision and Order conditionally granting the special exception, found as follows with regard to the appellants' opposition evidence:

> The protestants' concerns about adverse effect fall into two categories—noise from the operation of the airplanes, and their fears that an airplane will crash onto the ground, potentially on a house or one of the nearby schools.

> Addressing the possibility of an airplane crash, while the prospect may present a frightening vision, the statistics on the probability of such an occurrence submitted by the Petitioners illustrates the unlikelihood of this happening. Further, in reference to the nearby schools, the Noise Control Plan prohibits overflights of the three schools, so the possibility of a crash on one of the schools seems even less likely. Therefore, the owners of vicinal properties are not adversely affected by what is a remote possibility of one of the two or three planes crashing.

> The noise generated by these three planes, to which the Board will limit this operation to 7:00 a.m. to 10:00 p.m., is not of a degree sufficient to constitute an adverse effect upon the vicinal property owners. While any individual homeowner might not like the sound of an airplane's engine near his or her home, the operation of the three planes that may be stored on the airstrip do not rise to the level of adverse effect as contemplated by the Zoning Regulations.

6. It is unclear that Mr. Sharp sought the reduction because he felt the airport's operation adversely affected the resale value of his property. During his cross-examination, the following exchange took place between the applicants' attorney and Mr. Sharp regarding his meeting with the local Supervisor who denied his reduction initially:

Q. Because, he told you when he denied you, that there was absolutely no impact at all on prices caused by this airport.
A. I did not appeal the process due to prices.

However, the Board is changing the beginning of the hours of operation from 6:00 a.m. to 7:00 a.m. to ameliorate the impact of any noise upon adjacent landowners.

As an amplification of this attempt of showing adverse effect, many of the protestants have recounted instances of planes buzzing certain locations, and planes manifesting excessive noise. There was no evidence that these planes were any of those operated by the Petitioners.[7] Obviously the Petitioners cannot be held responsible for the actions of airplanes over which they have no control. This also applies to those instances where unauthorized planes or helicopters land at Glenair. If the Petitioners follow the Noise Control Plan, which they must, they will see to it that Section 15, *VISITING AIRCRAFT,* is carried out. This should minimize the number of landings of unauthorized aircraft.

As an adjunct to the protestants' inclusion of all incidents of small planes acting inappropriately, they also would have the Board consider their contention that the mere presence of the airport constitutes an attractive nuisance, drawing numerous disturbing flights in the area. This theory could apply to any location of a private airport. Presumably the Zoning Board was aware of the nature of private airports and any attraction they might have for other planes. Further, the instances recounted by the protestants do not rise to the level of adverse effect from the use.

The Board did not, in its Decision and Order, render any finding or conclusion regarding the appellants' argument and supporting evidence as to Glenair's effect, if any, on vicinal property values, apparently viewing it as an inherent consequence of the operation of a private airstrip regardless of where it was located in the R (Rural) District in Howard County.

------

7. Apparently to the contrary, the 20 May 1984 episode recounted by Robert V.L. Sharp involved a plane with identification number "N735PW" which Mr. Sharp recognized as being one that was stored on the parcel owned by Enos C. Levy, one of the applicants.

### ANALYSIS

Appellants contend that the Board did not properly apply the standard announced in *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981). They claim that the Board erred when it refused to make a finding of fact regarding the uniqueness of adverse effects on vicinal properties, in the face of uncontroverted evidence of both adverse effects and unique adverse effects on the vicinal properties. Relying on Anderson, *American Law of Zoning*, § 21.06, appellants suggest that all special exception uses generate some adverse effects, apparently regardless of where they might be located within a zoning district or category. The full impact of these adverse effects is tempered, in the first instance, by the express conditions placed on them and the findings required to be made before they can be approved by the legislative body, and, in the final analysis, by the application of the *Schultz v. Pritts* standard to the facts and circumstances of each individual petition as determined by the appropriate administrative agency. In that final analysis, appellants postulate that *Schultz v. Pritts* can only be correctly applied if the agency, the Board in this case, first identifies the universe of potential adverse effects inherently associated with the abstract special exception use (which the legislative body was presumptively aware of when it permitted the use only after the grant of a special exception). With those inherent adverse effects in mind, the Board must then analyze which of the actual adverse effects on adjoining and surrounding properties demonstrated in the particular application exceed, in kind or degree, the inherent adverse effects due to the proposed location of the subject property of the application.

The dispute over the interpretation and application of *Schultz v. Pritts* in the instant case stems, it seems to us, from two sources: (1) the Board unnecessarily courting a reversal of its action by not casting its Decision and Order in language more precisely parallel to the language of *Schultz;* and, (2) the appellants' interpretation of the holding of *Schultz* as if it were the atomic chart of elements from which a formula for divining inherent and peculiar adverse effects could be derived. A

close examination of how the Court arrived at *Schultz v. Pritts,* and those cases construing and applying *Schultz,* will reveal the bases for these two observations.

The late Judge Rita Davidson painstakingly traced the nature of special exceptions in Maryland as she developed the foundation for the Court's ultimate holding in *Schultz:*

> The general purpose of adequate land planning is to guide and accomplish the "coordinated, adjusted, and harmonious development of [a] jurisdiction ... which will ... promote ... [the] general welfare." Zoning is one of the important elements of land planning that is used to further this purpose.

> \* \* \* \* \* \*

> Zoning provides a tool by which to establish general areas or districts devoted to selected uses. Indeed, the very essence of zoning is the territorial division of land into use districts according to the character of the land and buildings, the suitability of land and buildings for particular uses, and uniformity of use.

> Generally, when a use district is established, the zoning regulations prescribe that certain uses are permitted as of right (permitted use), while other uses are permitted only under certain conditions (conditional or special exception use). *In determining which uses should be designated as permitted or conditional in a given use district, a legislative body considers the variety of possible uses available, examines the impact of the uses upon the various purposes of the zoning ordinance, determines which uses are compatible with each other and can share reciprocal benefits, and decides which uses will provide for coordinated, adjusted, and harmonious development of the district.*

> *Because the legislative body, in reaching its determination, is engaged in a balancing process, certain uses may be designated as permitted although they may not foster all of the purposes of the zoning regulations and, indeed, may have an adverse effect with respect to some of these purposes. Thus, when the legislative body determines that the*

*beneficial purposes that certain uses serve outweigh their possible adverse effect, such uses are designated as permitted uses and may be developed even though a particular permitted use at the particular location proposed would have an adverse effect above and beyond that ordinarily associated with such uses. For example, churches and schools generally are designated as permitted uses. Such uses may be developed, although at the particular location proposed they may have an adverse effect on a factor such as traffic, because the moral and educational purposes served are deemed to outweigh this particular adverse effect.*

*When the legislative body determines that other uses are compatible with the permitted uses in a use district, but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses. Such uses cannot be developed if at the particular location proposed they have an adverse effect above and beyond that ordinarily associated with such uses. For example, funeral establishments generally are designated as special exception uses. Such uses may not be developed if at the particular location proposed they have an adverse effect upon a factor such as traffic because the legislative body has determined that the beneficial purposes that such establishment serve do not necessarily outweigh their possible adverse effects.*

More particularly, by definition, a permitted use may be developed even though it has an adverse effect upon traffic in the particular location proposed. By definition, a requested special exception use producing the same adverse effect at the same location must be denied. Thus, by definition, a church may be developed even if the volume of traffic that it generates causes congestion and unsafe conditions at the particular location proposed. By definition, however, a special exception use for a funeral establishment producing the same volume of traffic and, therefore, the same congestion and unsafe conditions at the particular location proposed must be denied. It is precisely because a

permitted use may be developed even though it may have an adverse effect on traffic at the particular location proposed, whereas a special exception use may not, that to grant a requested special exception use on the ground that it generates traffic volume no greater than that generated by a permitted use is logically inconsistent and in conflict with previously established standards. (citations and footnotes omitted) (emphasis in original and supplied).

291 Md. at 19–22, 432 A.2d 1319.

Judge Davidson equally patiently, but more succinctly, summarized the "frequently expressed" applicable standards for judicial review of the grant or denial of a special exception:

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.* The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the

Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal. These standards dictate that if a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied. (citations omitted; emphasis in original).

291 Md. at 11–12, 432 A.2d 1319.

The nature of the requisite adverse effect that would compel denial of a special exception was explored in *Schultz* in the discussion contrasting *Deen v. Baltimore Gas & Elec. Co.,* 240 Md. 317, 214 A.2d 146 (1965) (where the zoning body approved a special exception for construction of above-ground high tension transmission lines) with *Anderson v. Sawyer,* 23 Md. App. 612, 329 A.2d 716 (1974) (where the zoning body denied a special exception for a funeral home). In *Deen,* B G & E's request involved traversing a rural area with its service lines. The board of appeals, in approving the special exception, concluded that, pursuant to the Baltimore County Zoning Regulations, the requested use would not be "detrimental to the health, safety, or general welfare of the locality involved." In the face of an appeal by opposing land owners from the rural area to be traversed, both the circuit court and the Court of Appeals affirmed. The Court observed in its opinion:

"Appellants assert that it was error for the Board to fail to consider the future effects which the high tension wires would have on the health, safety and general welfare of the locality 'which could be reasonably anticipated in the normal course of its development.' This factor was without relevance in this case, *because there was no evidence produced at the hearing which would show that the effect of high tension wires on the future health, safety and welfare of this area would be in any respect different than its effect on any other rural area. Section 502.1 implies that the effect on health, safety or general welfare must be in some sense unique or else a special exception could never be granted in*

*such an area for the above ground location of high tension wires.* The only evidence as to future conditions was testimony revealing the possibility of future residential development of this land but such a possibility alone does not come close to showing a future deleterious effect upon the public health, safety or general welfare." *Deen,* 240 Md. at 330–331, 214 A.2d 146. (emphasis in original).
291 Md. at 12–13, 432 A.2d 1319.

In *Anderson v. Sawyer,* the requested special exception use was for a funeral home in a residential zone. In addition to traffic congestion, the protestants mounted an argument that the mere presence of a funeral home would adversely affect property values. The Baltimore County zoning body succumbed to the protestants' arguments and denied the application, finding it would "be detrimental otherwise to the general welfare of locality involved." The applicants appealed to the circuit court, which reversed the board's denial. The protestants appealed to the Court of Special Appeals. We affirmed the circuit court. *Schultz* noted that, in so doing, we observed with regard to the allegations concerning adverse effects on property values:

"There can be no doubt that an undertaking business has an inherent depressing and disturbing psychological effect which may adversely affect persons residing in the immediate neighborhood in the enjoyment of their homes and which may lessen the values thereof. Indeed, it is precisely because of such inherent deleterious effects that the action of a local legislature in prohibiting such uses in a given zone or zones will be regarded as promoting the general welfare and as constitutionally sound. But in the instant case the legislature of Baltimore County has determined that as part of its comprehensive plan funeral homes are to be allowed in residential zones notwithstanding their inherent deleterious effects. By defining a funeral home as an appropriate use by way of special exception, the legislature of Baltimore County has, in essence, declared that such uses, if they satisfy the other specific requirements of the ordinance, do promote the health, safety and general welfare of the com-

munity.  As part of the comprehensive zoning plan this legislative declaration shares in a presumption of validity and correctness which the courts will honor.

*The presumption that the general welfare is promoted by allowing funeral homes in a residential use district, notwithstanding their inherent depressing effects, cannot be overcome unless there are strong and substantial existing facts or circumstances showing that the particularized proposed use has detrimental effects above and beyond the inherent ones ordinarily associated with such uses.*  Consequently, the bald allegation that a funeral home use is inherently psychologically depressing and adversely influences adjoining property values, as well as other evidence which confirms that generally accepted conclusion, is insufficient to overcome the presumption that such a use promotes the general welfare of a local community.  *Because there were neither facts nor valid reasons to support the conclusion that the grant of the requested special exception would adversely affect adjoining and surrounding properties in any way other than would result from the location of any funeral home in any residential zone, the evidence presented by the protestants was, in effect, no evidence at all."* *Anderson,* 23 Md.App. at 624–25, 329 A.2d 716 (emphasis in original) (citations omitted).

291 Md. at 13–14, 432 A.2d 1319.

Judge Davidson concluded in *Schultz* that *Deen* and *Anderson*

establish that a special exception use has an adverse effect and must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone.  Thus, these cases establish that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts

and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

291 Md. at 15, 432 A.2d 1319.

From the foregoing analysis, the holding of *Schultz v. Pritts* succinctly followed:

We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

291 Md. at 22–23, 432 A.2d 1319.

Not surprisingly, the first case to discuss *Schultz v. Pritts* involved Glenair. The late Judge Thomas Hunter Lowe, delivering the opinion of the Court of Special Appeals in *Sharp v. Somerlock, supra,* endorsed the trial court's view of *Schultz's* significance:

the new test was whether the proposed use would "have any adverse effects above and beyond those inherently associated with such special exception use irrespective of its location within the zone." (citation omitted).

52 Md.App. at 210, 447 A.2d 500.

Favorably referencing the trial judge's words focusing the Board on its task pursuant to *Schultz,* Judge Lowe endorsed the position that

[w]hat the Board of Appeals must consider is whether the use contemplated by the subject petition would have adverse effects other than those adverse effects that would be

caused by the existence of an airport meeting the applicable standards in any other part of the R zone.

52 Md.App. at 210, 447 A.2d 500.

He added his own admonition that the Board, on remand, ought to focus on the testimony of one Nancy Adams, which he asserted "classically exemplified the *Schultz* criterion of a particular adverse effect." Before the Board, Ms. Adams had

testified that she purchased a 107–acre farm directly across Sharp Road from the Sharp Farm, and partially moved there in December, 1978, unaware of the petition for an airstrip or that a demonstration was scheduled to be conducted. She purchased the farm to train thoroughbred racehorses, mainly for Maryland tracks. Adams testified that on the morning of the demonstration, she had 15 horses in the lower pasture when a plane flew in over her barn, looking as if it "was going to crash into the hill." She said her horses are very high-strung animals and that they began going "crazy" in the field. She feared some might break through the fences, because they were running wildly through the fields trying to get away from the noise. She had 51 horses at that time, and some of them were with foal, including one which was insured for $100,000.00. Adams testified to having observed high-strung racehorses injure themselves when excited, and said she had never seen her horses as excited as they were when the airplanes flew over during the takeoffs and landings for the aerial demonstration.

*Id.* at 207–08, 447 A.2d 500.

For our present purposes, it is not important that Ms. Adams' testimony did not, on remand, prove to be all that Judge Lowe had summarized from her prior appearance before the Board.[8] What is significant is that we recognized that the type of

---

8. It has been suggested by the applicants that Ms. Adams' testimony in 1978–79 was not truthful. She failed to appear before the Board when it conducted hearings following the remand directed in *Sharp v. Somerlock.*

alleged localized impact represented by her testimony had to be considered by the Board in light of the *Schultz* standard.

The next meaningful consideration of *Schultz* is found in *Board of County Commissioners for Cecil County v. Holbrook*, 314 Md. 210, 550 A.2d 664 (1988). Judge Cole, writing for the Court, summarized *Schultz* as teaching that

> where the facts and circumstances indicate that the particular special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone, the application should be denied. Furthermore, if the evidence makes the issue of harm fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court.

314 Md. at 217–18, 550 A.2d 664.

*Holbrook* involved a special exception request for the permanent establishment of a mobile home in an agriculturally zoned and sparsely developed area of Cecil County. The mobile home, which had been placed on the applicant's property originally as a temporary structure, was sited in a clearing near a boundary with the property of a protestant. The protestant's home, newly constructed before the mobile home owner sought permanent approval for his dwelling, was situated 80–150 feet away from the mobile home, within clear lines of sight from each other. There was no meaningful landscaping or vegetation between the two structures that would obscure the view. The special exception applicant's property, comprising 2.8 acres, was densely wooded, except for the clearing where the mobile home was located and the area between it and the neighbor's boundary line.

The protestants, with whom the zoning body agreed, decried the debilitating effect of the mobile home on the value of their properties. The zoning body denied the special exception finding the proposed use would "otherwise substantially diminish adjacent property values" and that, under *Schultz*, it would "create significantly greater adverse effects in this location

that were it located in other areas in the zone." The circuit court affirmed the zoning body's denial. We, on the other hand, reversed the circuit court, basing our holding on the premise that regardless of a mobile home's particular location within a zone, its negative impact on adjacent properties would remain the same. In reversing us and affirming the circuit court and zoning body, the Court found

> no cause to question the Board's conclusion that the mobile home, in this particular location, would impair neighboring property value to a greater extent than it would elsewhere in the zone. Countless locations exist within the zone, and indeed, within Holbrook's own property, where the presence of a mobile home would have no effect whatsoever upon adjoining property values. If, for example, trees or topography hid the mobile home from the view of the neighboring property owners, there would remain, as the Board's counsel conceded, absolutely no grounds for denying a special exception permit. The Court of Special Appeals failed to acknowledge these potential scenarios.
>
> \*    \*    \*    \*    \*    \*
>
> At any rate, in light of the mobile home's high degree of visibility in this particular location, its proximity to the Peters's home, and the markedly disparate values of the Holbrook and Peters residences, we hold that the Board reasonably concluded that the permanent presence of the Holbrook mobile home would create significantly greater adverse effects in this location than were it located elsewhere in the zone.

314 Md. at 220, 550 A.2d 664.

Thus, the Court construed the relative lack of vegetative screening between the two structures and the apparently level topography as sufficient localized circumstances that rendered the adverse property value impact, arguably always inherent in this particular use, uniquely adverse.

The most recent revisiting of *Schultz's* teachings is found in *People's Counsel v. Mangione*, 85 Md.App. 738, 584 A.2d 1318 (1991). *Mangione* addressed the denial by the Baltimore

County Board of Appeals of a special exception for a 240 bed nursing home to be located on residentially-zoned land. The subject property of 4.0 acres was located interior to an area of existing single family homes. Vehicular access to the nearest major road, which was one block away, was via residential subdivision streets. In its discussion, the board identified the areas of uncommon problems created by the proposed use: the size of the proposed building and adjacent parking (100 spaces) would "overwhelm and dominate" the surrounding residential community, the project would "exacerbate an already worsening storm water runoff situation within this community," and the traffic would "overtax" the residentially-sized community roads. The board therefore concluded that the applicant had failed to meet his burden to persuade it that the proposed use would not be "detrimental to the health, safety, or welfare of the locality."

After liberally quoting from *Schultz* and *Holbrook*, much as we have done here, Judge Cathell, writing for us, concluded

Before the Board were various facts and circumstances which, we believe, satisfy the *Schultz* standard of particular adverse impact. The Board, under the *Schultz* standard, reviewed the evidence for the required particular adverse impact. There was testimony that the proposed convalescent home would sit on the prominent or dominant terrain above the neighborhood, which would block out light from the west; and with prevailing breezes from the west, would generate odors from the central kitchen as well as from the dumpster. There was testimony concerning the effects of the development along the York Road corridor and the erosion created by the development and storm water runoff. There was testimony concerning the effects of the intrusion of the project into the residential neighborhood presently existing around that location. There was testimony about small arterial streets whose only access to York Road from the community was by way of Greenridge Road, and that the narrow, winding nature of those streets, with the increased traffic, would jeopardize the safety of the children playing in the streets. Furthermore, there was testimony

concerning the overflow of contaminated medical waste and storm water management.

The Board, as finder of fact, said it was "obligated to judge the credibility of each witness and apply each Board member's own knowledge, developed through experience and training, to the evidence presented." In sum, the Board concluded that the proposed project would "overwhelm and dominate the surrounding landscape," and that it would represent "the deepest intrusion into the residential community of Dulaney Valley." The Board found that the project would "clearly exacerbate an already worsening storm water runoff situation" within that community. Further, the Board was unconvinced that the "traffic generated by the home's employees and visitors would not overtax an interior community road system designed to accommodate residential traffic."

*　　*　　*　　*　　*　　*

Given those facts and circumstances, we believe there was sufficient showing of particular adverse impact as required under *Schultz*.

### Conclusion

"The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan." *Schultz*, 291 Md. at 11 [432 A.2d 1319]. (Emphasis in original.) We conclude that the Board's decision, denying the special exception, was not arbitrary and capricious. (footnote omitted; emphasis in original).

85 Md.App. at 751–53, 584 A.2d 1318.

■ Returning to the parties' contentions in the case *sub judice,* we decline their invitation to resolve their debate as to whether all special exception uses necessarily possess inherent adverse effects, regardless of where they may be sited in the relevant zoning district(s). That some, though not necessarily all, of the universe of special exception uses may have *possible*

adverse effects was made plain in *Schultz.* 291 Md. at 21–22, 432 A.2d 1319. We are not aware, however, of any place in an ordinance, statute, or the record of the case *sub judice* where the legislative body that decided to allow certain uses as permitted uses and other uses only by the grant of a special exception has catalogued which inherent adverse effects associated with a particular use it considered in resolving the tug of war between "beneficial purposes" and "possible adverse effect." *Id.,* 291 Md. at 21, 432 A.2d 1319. Thus, absent such a foundation, whether the presumption that the abstract special exception use is in the interest of the general welfare is rebutted must be addressed by the zoning body to which the legislative body has delegated that responsibility on a case-by-case basis.

In any case-by-case analysis, the zoning body may, in the application of its expertise, recognize effects of a proposed use that it considers common to that use regardless of where it may be located in the applicable zone(s). In the instant case, we are not prepared to say that the Board's Decision and Order incorrectly interprets the holding of *Schultz.* As we read the Board's decision, it treated, or equated, the adverse effects resulting from the existing or proposed operations of Glenair as those, in kind and degree, inherent in the operation of a private airfield and airplane storage use regardless of where it may be sited in the R District. Thus, the Board's finding that Glenair will have no adverse effect on vicinal properties should not be interpreted as literally meaning that there will not be any adverse effects, but that such effects as were demonstrated led it to a conclusion that the effects were inherent in the use and were not made atypical by virtue of where Glenair is actually located. This does not reflect an erroneous understanding of *Schultz,* no matter how unartfully the Board framed the language of the decision.

The Board had before it substantial evidence to support its finding that potential dangers from airplane crashes were such a remote possibility as not to constitute an adverse effect to

the owners of vicinal properties. The Board specifically made reference to statistical information compiled by the FAA and AOPA and the restrictions imposed or undertaken in the noise control plan as approved.

We have demonstrated earlier the fairly debatable nature of the evidence before the Board concerning any adverse impact upon property values.

The Board's findings as to impacts on vicinal properties due to noise from either Glenair's operations directly or the opposition's "attractive nuisance" theory regarding non-Glenair aircraft also were within the realm of the fairly debatable based on the evidence before it.

The Board in the instant case was correct to treat noise generally as an adverse effect possibly inherent to the operation of a private airport regardless of where it was located in the R–District in Howard County. It indicated that the legislative body must have also foreseen such a potential when it determined to allow such uses with the grant of a special exception in the same zone that allowed as permitted uses single family homes on minimum three acre lots. It was also well within the realm of the fairly debatable, based on this record, for the Board to have resolved that the actual noise generated by Glenair's operations did not rise to the level of adverse effects beyond those inherent in such an airfield located anywhere in the R–District. The Board had before it actual noise measurements (apparently considered pursuant to § 10–911, Md. Courts & Judicial Proceedings Code) from which comparisons to objective, regulatory standards could be made. It also had before it objective conditions and limitations in the noise control plan, some volunteered by the applicants and some imposed by the Board. The noise control plan, as we noted earlier, was prepared in accordance with regulations promulgated by the MAA. As required, the plan mapped on adjacent properties what the perceived noise levels would be from the projected operation of Glenair. The prescribed methodology took into account, among other things, distance and topography. The results indicated that noise

levels would not exceed the State's maximum threshold for property zoned to permit the development of single family, detached homes. The Board also had before it testimony from some neighbors, though contradicted by other neighbors, that Glenair's noise did not bother or inhibit them in the enjoyment of their properties. The Board could, and did, rationally ignore impacts from aircraft not associated with Glenair or where the complainant could not be actually linked to a Glenair plane or an invited guest's craft.

The Board also resolved in the applicants' favor the only significant conflict in the evidence concerning noise that clearly exemplified an alleged *Schultz*-type particularized adverse effect. The applicants contended in the supporting documentation to their application when filed that Glenair was "higher than the surrounding land." They continued from this premise to assert that "[t]he elevation difference keeps airplanes higher above the surrounding land and buildings during landings and takeoffs." Indeed, Mr. Selby of the MAA stated that Glenair's elevation was "higher than the surrounding terrain." The Technical Staff of the Howard County Office of Planning and Zoning, in its report and recommendation on the special exception application, also concluded that the subject property and its airfield were "on a ridgeline that places them slightly above surrounding properties to the north, west, and south."

To the contrary, at least one opposition witness, who remains an appellant in this case (unlike Ms. Adams), Mr. Robert V.L. Sharp, testified that the closest boundary of his property was 600–650 feet west of the westerly end of the Glenair airstrip, and that his land was "higher than the runway." He attributed to this difference in elevation, and to some unspecified "grading into the hill" which he claimed was accomplished by the applicants, some role in the episode he claimed to have experienced on 20 May 1984 when a plane identified with Glenair startled him with its noise during takeoff as it suddenly appeared over him. The airplane noise was startling even over the noise generated by the tractor pulling a bush-hog mower which Mr. Sharp was driving. The noise caused a reflexive spasm and an injury (although appar-

ently not a serious one) to his leg. There was also some evidence introduced through the opposition witness, Clyde W. Pace, that seemed to challenge whether the vicinal properties were at a higher or lower elevation than Glenair. In addition, the opponents presented documentary evidence in support of their contention that there were other expanses of R–District land in Howard County that did not have the elevation difference that they contended contributed to particular adverse noise effects in Glenair's case.

The Board, whose job it is to resolve such conflicts, has done so. That topography and distance play roles in exacerbating or ameliorating noise perception is a physical fact. *See generally* COMAR 11.03.03 (regulations promulgated by State Department of Transportation, State Aviation Administration, for its statewide Airport Noise Control Program). The Board did not accept Mr. Sharp's characterization of the relative elevations, and assigned no significance to his single episode from 1984, in the face of the overwhelmingly more precise, current, and empirical evidence to the contrary.

■ The function of a zoning board is to exercise discretion (the discretion of experts in their particular field) in deciding matters brought before it. We shall not substitute our judgment for that of the Board when, as here, it was acting within its discretionary range. *Enviro–Gro v. Bockelmann,* 88 Md. App. 323, 335, 594 A.2d 1190, *cert. denied,* 325 Md. 94, 599 A.2d 447 (1991); *B.P. Oil v. County Board of Appeals,* 42 Md.App. 576, 577, 401 A.2d 1054 (1979).

*Cogito obesa cantavit in hoc lis (I think the Wagnerian soprano has sung in this case).*

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.